1          **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF FLORIDA**
2              **PENSACOLA DIVISION**

3
ABDELAZIZ HAMZE,              )
4                             )
              Plaintiff,      ) Case No: 3:22-CV-4978
5                             )
       v.                     ) Pensacola, Florida
6                             ) November 1, 2023
                              )
7  LT. SETTLEMIRES, ET AL.,   )
                              )
8              Defendant.     )
9  _____)

10            **DAWN SAENZ'S TRIAL TESTIMONY**
      **BEFORE THE HONORABLE T. KENT WETHERELL, II**
11            **UNITED STATES DISTRICT JUDGE**
                **(Pages 1 through 30)**

12
   APPEARANCES:
13
   For the Plaintiff:      Slater Legal PLLC
14                          by:  **JAMES M. SLATER**
                            113 South Monroe Street
15                          Tallahassee, Florida 32301

16                          The Tarjan Law Firm PA
                            by:  **JOSHUA M. TARJAN**
17                          12372 SW 82nd Avenue
                            Pinecrest, Florida 33156
18

19 For the Defendant:       Office of the Attorney General
                            by:  **ERIK D. KVERNE** and
20                               **SAMANTHA-JOSEPHINE BAKER**
                            The Capitol, Suite PL-01
21                          400 South Monroe Street
                            Tallahassee, Florida 32399
22

23

24            *Julie A. Wycoff, RMR, CRR*
         *Official United States Court Reporter*
25        *(850) 470-8196 * julieawycoff@gmail.com*

1          **P R O C E E D I N G S**

2          *(Excerpt of trial transcript.)*

3              THE COURT:  All right.  Your next witness.

4              MS. BAKER:  Dawn Saenz.

5          **DAWN SAENZ, DEFENSE WITNESS, DULY SWORN**

6              DEPUTY CLERK:  Please state and spell your full name.

7              THE WITNESS:  Dawn, D-A-W-N.  Saenz, S-A-E-N-Z.

8                        **DIRECT EXAMINATION**

9    BY MS. BAKER:

10   Q.   Good morning, Ms. Saenz.  How are you today?

11   A.   Tired.

12   Q.   Did you just get off work?

13   A.   I did.

14   Q.   Okay.  We'll hopefully try to make this quick and then you

15   can go to bed.

16   A.   All right.  Thank you.

17   Q.   Can you tell the jury where you worked on June 10th, 2018?

18   A.   Santa Rosa Correctional Facility.

19   Q.   And what was your occupation there?

20   A.   Registered nurse.

21   Q.   And how long had you worked at Santa Rosa?

22   A.   About two years at that point.

23   Q.   Do you currently work there?

24   A.   No.

25   Q.   Where are you employed now?

SAENZ - DIRECT

1    A.    Lakeview Center in a psychiatric facility.

2    Q.    And what is --

3    A.    For adolescence.

4    Q.    With adolescence you said?

5    A.    Psychiatric nurse.

6    Q.    Okay.  And how long have you been there?

7    A.    Since I left Centurion at Santa Rosa.  I think August of

8    2018, I think.

9    Q.    What is Centurion?

10   A.    It's a private healthcare contractor with the Florida

11   prison system.

12   Q.    So you were employed and paid by Centurion, not the Florida

13   Department of Corrections, correct?

14   A.    Correct.

15   Q.    Is it fair to say that you were a contractor of the

16   department?

17   A.    Well, indirectly, yeah, because I was employed by

18   Centurion, not directly contracted with the prison myself, but.

19   Q.    Did you ever work with any other prisons or just at Santa

20   Rosa?

21   A.    I worked in Alabama years ago as, like, a part-time job at

22   one of the -- Fountain, I think, Correction just on the

23   weekends.

24   Q.    Okay.  And why did you leave the department?

25   A.    Santa Rosa?

SAENZ - DIRECT

1   Q.   Why did you leave Centurion, I guess, I should say.

2   A.   It just wasn't for me.  You know, it just wasn't the type

3   of nursing I was interested in.

4   Q.   And now you're in the psychiatry field?

5   A.   Right.

6   Q.   Do you remember if you were working on June 10th, 2018?

7   A.   No, but I probably was.

8   Q.   And did you typically work days or nights?

9   A.   For a good period of the time whenever I was employed

10  there, I worked day shift, and I was the charge nurse.  But then

11  it was just so much responsibility.  I just wanted to go to

12  night shift, so I'm not sure at that point if I was working day

13  shift or night shift.

14  Q.   I'm going to show you what's been previously marked and

15  admitted as Plaintiff's Exhibit 5.

16          If we could publish this, Your Honor, madam clerk.

17          Do you recognize, this, ma'am?

18  A.   Mm-hmm, I do.

19  Q.   And what is it?

20  A.   Can you bring it down?  Let me see the top of it.

21  Q.   Try to zoom out a little bit.

22  A.   It says the inmate after an alleged post use of force, so

23  it's an emergency room record.

24  Q.   Is this your signature?  I'm sorry.  That's the first line?

25  A.   Yes.

1   Q.   And whose signature is that below that?

2   A.   I think that was Dr. Rodriguez.

3   Q.   And can you tell the jury about the procedure of proposed

4   use of force?

5   A.   From what I remember, being that it was five years ago, if

6   there was an incident where an inmate and an officer had some

7   type of altercation, like if they had to go in and do a cell

8   extraction and the inmate was violent and so the officer had to

9   subdue him and there was an injury in the process, they had to

10  come and we had to assess them, and that's how we documented it

11  as a post use of force.

12  Q.   And are these your notes or Dr. Rodriguez's notes on this

13  emergency room record?

14  A.   My notes.

15  Q.   Are you -- do you recall this specific exam with plaintiff?

16  A.   After we talked about it and I saw the video of the

17  particular inmate, I vaguely remember, being that it's five

18  years ago.  I vaguely remember, you know, the details of it, but

19  for the most part, I do.

20  Q.   At the time of the incident, you wrote this report, was

21  everything that you indicated true and accurate?

22  A.   Yeah, I never documented anything that I didn't see and

23  witness and assess, so, yes.

24  Q.   Is it fair to say that you also documented what you didn't

25  see on this report?

1  A.   Yeah.  No laceration noted, no bleeding, no swelling to

2  facial area.

3  Q.   And what did you note?

4  A.   I noted a small reddened area to the bottom lip area.  He

5  was ambulating without difficulty, alert and oriented.  I noted

6  a small superficial abrasion to the right side of his forehead,

7  and I said he was alert and oriented and no injuries noted and

8  that Dr. Rodriguez was present and he removed his splint and

9  applied a full cast to his left arm.  And he responded to

10 treatment without difficulty.

11 Q.   And you mentioned a video.  Would that have been the

12 handheld video with the officer standing outside the medical

13 room?

14 A.   Right, right, so that I could see the inmate and then jog

15 my memory of who he was.

16 Q.   Did you remember him once you saw the video?

17 A.   Yes.

18 Q.   Do you remember anything in particular with the exam?

19 A.   No.  I mean, except that clearly his face was not injured

20 in the video.  I remember that.  He was very calm.

21 Q.   Was he cooperative?

22 A.   Mm-hmm.

23 Q.   That's a yes?

24 A.   Yes, sorry.

25 Q.   Thank you.  How many post-use-of-force exams would you do

SAENZ - DIRECT

1   on a day?

2   A.   Sometimes two or three.  It just -- it varied.

3   Q.   And did you particularly work in the mental health dorm, in

4   Q dorm?

5   A.   Yes.

6   Q.   Can you explain a little bit how the setup was there, where

7   your station was located?

8   A.   The triage emergency treatment room was downstairs, and it

9   was in a big dorm, and it had different quads with top stairs

10  and bottom stairs of individual cells.  So the inmates wouldn't

11  walk around freely.  You know, when they came out, they were

12  handcuffed.  So we didn't have a lot of direct interaction with

13  them unless an officer brought them to us, and they would notify

14  our nursing station, where all the charts were, where

15  Dr. Calnado, our psychiatrist.  We were upstairs.

16          So when we were notified to come down there, that's

17  when we, you know, came down there.  Or if an inmate had a sick

18  call and wanted to be, you know, seen for something, you know,

19  of course we would have that scheduled, but that's kind of how

20  it went.  You know, they didn't just walk up to us freely, you

21  know.  They were always handcuffed and escorted to us.

22  Q.   So the triage room that you referred to is on the first

23  floor.  That's where the inmate cells were?

24  A.   Yes.  In the entrance of the dorm kind of in a sallyport,

25  and it's to the left.  There's actually another examination room

1    to the right, and then there's a grille gate, you know, that

2    they open up, and then it's the dorm with four different quads.

3    Q.   What is the term you used, a grille gate?

4    A.   Yeah, I guess that's what it's called, just the

5    terminology.  I heard them call it, and they would have to buzz

6    it open to let us in and out.

7    Q.   And that went for even for medical providers?

8    A.   Oh, yeah, mm-hmm.

9    Q.   And the sallyport that you mentioned, approximately how far

10   was it from the triage room?

11   A.   It was in the sallyport, like, the entrance to the dorm.

12   It's a little hallway, and then a grille gate, like a metal door

13   with bars.  And then there was a little office and then two exam

14   rooms, and then past the door with metal bars was a dorm with

15   four different quads, four different individual dorms within the

16   dorm.

17   Q.   But how far was the sallyport from the particular triage

18   room?  How many steps, can you estimate?

19   A.   I don't know.  Let's see.  From here to those gentlemen

20   right there, may be it was the entire sallyport, and probably

21   halfway in between was the exam room that I worked in a lot,

22   specifically that day.

23   Q.   If --

24   A.   Maybe not even that far.  5 feet.

25   Q.   Okay.  But if the --

SAENZ - DIRECT

1    A.    10 feet from a room.

2    Q.    -- use of force occurred in the sallyport, do you know if

3    you would hear or see anything from the triage room?

4    A.    Absolutely.  I mean, I may not see it directly, but I would

5    definitely hear anything that would be happening because the

6    door is right here.  I would have to get up and look, but

7    absolutely I would hear it because the door was always open.

8    Q.    And do you recall specifically hearing anything on this

9    day?

10   A.    No.

11   Q.    Is the triage room always staffed?

12   A.    I'm sorry?

13   Q.    Is it the triage room always staffed?

14   A.    Staffed?

15   Q.    By medical staff?

16   A.    No.  Sometimes it's locked.  If we didn't have their call

17   outs, like scheduled appointments with the provider, a nurse

18   would go down there and assist with the doctor for different

19   procedures or just a general follow up for medication

20   management.  So if we didn't have the appointments, if we didn't

21   have a medical emergency, then the door was locked and we were

22   upstairs.

23   Q.    Okay.

24   A.    Or making rounds on the unit, which we had to do.  I think

25   it was every 30 minutes, escorted by an officer.

SAENZ - DIRECT

1    Q.    And what did making rounds entail?

2    A.    Walking and looking in each cell to make sure that the

3    inmates were safe and alive and no complaints.  We were escorted

4    by an officer.

5    Q.    And typically what would you look for?

6    A.    That they were breathing, weren't complaining of pain, that

7    they were ambulating, oriented; but it was a quick -- we didn't

8    have time to, like, assess.  It was a quick visual.

9    Q.    And would you have documented that somewhere?

10   A.    Yeah, I think there was a flow sheet that we had.  Like I

11   said, it's been quite a while since I've -- was there.  There

12   was a flow sheet that we had to sign off of that we made rounds.

13   Q.    I understand.  Next I want to show you what's been marked

14   as Plaintiff's Exhibit 3.  It's already been admitted.

15          Do you recognize this document?

16   A.    Yeah.  I think that was, like, a second page to the, like,

17   a body audit chart to the -- my assessment.

18   Q.    Okay.  And what is this -- well, first of all, this is your

19   signature here?

20   A.    Yes.

21   Q.    And do you recall filling out this form?

22   A.    Yes.

23   Q.    And is everything that you wrote true and accurate?

24   A.    Yes, absolutely.

25   Q.    Did it reflect your impressions at the time you examined

SAENZ - DIRECT

1    Mr. Hamze?

2    A.   Yes.

3    Q.   What does this diagram show?

4    A.   I have the number one up there notated with an arrow to an

5    area of his right forehead, which, you know, was the site of the

6    superficial abrasion.

7    Q.   And what time did you make this report?

8    A.   Let's see.  It says 1945, 7:45 at night.

9    Q.   And were these the standard use-of-force report documents

10   that you would fill out?

11   A.   Yes.

12   Q.   I'd like to show you -- I think it's been marked as a

13   composite exhibit, 29.  It's been previously admitted.

14           Do you recognize this document?

15   A.   No.

16   Q.   Are you able to --

17   A.   It's not my handwriting, so I didn't --

18   Q.   Are you able to identify the signature or the handwriting?

19   A.   It is Mindy Reyes.

20   Q.   Who is Mindy Reyes?

21   A.   She was an LPN that worked with me almost every day.

22   Q.   And did she also work with you when you were the charge

23   nurse?

24   A.   Yes.

25   Q.   And is that how you can recognize her handwriting?

1    A.    Yes.

2    Q.    Besides the fact that her stamp is down below?

3    A.    Well, I mean, it's been a long time, like I said, and I

4    don't look at her handwriting all the time, but I do recognize

5    her signature.

6    Q.    Tell me how the signature and the stamps work.

7    A.    You couldn't have one without the other.  It's a Department

8    of Corrections rule that we have to stamp next to our signature.

9    Q.    And where would you keep the stamp?

10   A.    In our lab coat, in our pocket, on our person so that

11   nobody could get it, use it, whatever.

12   Q.    And would you also wear ID?

13   A.    Yes.

14   Q.    Was that issued by the Department of Corrections?

15   A.    Centurion.

16   Q.    Okay.  What is this a photo of?  What room is this?  And,

17   I'm sorry, this has previously been admitted and marked as

18   Defendant's Exhibit 31.

19   A.    It looks like our triage slash exam room.

20   Q.    Do you know if this was the exam room that you saw

21   plaintiff in?

22   A.    That was the main one we used, yes.

23   Q.    And this is -- you can see the time stamp there, June 5th.

24   This is not the day you examined Mr. Hamze, right?

25   A.    Not according to my documentation, no.

SAENZ - DIRECT

1  Q.   Are you able to recognize any individual in the photo?

2  A.   No, because their back is turned, but it's clearly a

3  lieutenant with a white shirt.

4  Q.   How do you know it was a lieutenant --

5  A.   They all --

6  Q.   -- in the white shirt?

7  A.   They all wear white shirts.

8  Q.   Okay.  Zoom in a little bit.  I have a glare, but are you

9  able to identify a silhouette of an individual in front of a

10  door?

11  A.   I mean, it kind of looks like Mindy Reyes from here, her

12  long hair.  It sort of looks like her from there, but I can't

13  tell who the lieutenant is.

14  Q.   Okay.  And how many -- do you know how many nurses would be

15  on shift?

16  A.   So our psychiatrist upstairs had to have a nurse with him

17  at all times for -- to help him with orders and make rounds

18  and -- so there was always usually one, maybe two nurses

19  upstairs with the doctor, the psychiatrist, and then a couple of

20  nurses downstairs with the medical provider.  Or it may have

21  been just us assessing a patient, you know, without the medical

22  provider.  So it's usually probably two or three, maybe four --

23  Q.   Okay.

24  A.   -- for a shift, doing different tasks.

25  Q.   I know that you stated that your report was correct and

SAENZ - CROSS

1   accurate at the time that you made it.  Did you always document

2   injuries as you saw them?

3   A.   Always.

4   Q.   Were you ever asked to falsify an injury by an officer?

5   A.   Never and if they had, I wouldn't have done it.  I mean,

6   that's my license.

7   Q.   What would happen if you did so?

8   A.   I could lose my license.  Not to mention I wouldn't be able

9   to sleep at night.  I would never falsify.

10          MS. BAKER:  That's all I have.  Thank you, ma'am.

11          THE COURT:  All right.  Cross-examination?

12                    **CROSS-EXAMINATION**

13   BY MR. TARJAN:

14   Q.   Good morning.

15   A.   Hi.

16   Q.   When you started working for Centurion and you -- did you

17   work in any other facilities besides Santa Rosa?

18   A.   At that time?

19   Q.   Well, let me ask you a better question.

20          When you started with Centurion, what was the first

21   facility that you worked at?

22   A.   In my career?

23   Q.   Yes.

24   A.   Well, I've been a nurse for 29 years.

25   Q.   And how long were you with Centurion?

1   A.    Two.

2   Q.    Two years.  When you were with Centurion, did they send you

3   right away when you started working with them to some type of

4   prison or correctional facility?

5   A.    Oh, when I started working with Centurion?

6   Q.    Right.

7   A.    Right.  They hired me specifically for Santa Rosa

8   Correctional Institution.

9   Q.    And can you describe -- did you receive any sort of

10  training in terms of how to work with inmates in terms of

11  security?

12  A.    We did go through an orientation training by a specific

13  officer.  We went over the rules, and, you know, what's allowed,

14  what's not allowed, those type things, yeah.  And then I was

15  trained by Centurion staff after that.

16  Q.    Okay.

17  A.    But not -- we weren't trained as an officer, you know what

18  I mean?

19  Q.    Sure.

20  A.    Just the basic rules.

21  Q.    And what were the basic rules that you were instructed?

22  A.    You know, generic things like don't bring a cell phone

23  because it's a felony on the premises, you know what I mean?

24  And, I mean, nothing directly related with the care and custody

25  of inmates.  That was not our duty.  Our duty was not to

SAENZ - CROSS

1    interact with them other than take care of their medical needs

2    when an officer brought them to us.

3    Q.   Were you given any instruction on, you know, whether to

4    step away if inmates are being moved, for example?

5    A.   No, but it was general knowledge because a lot of inmates

6    were dangerous, that -- and they were handcuffed.  The officers,

7    you know, kind of were our protector, so we -- we wanted to stay

8    out of the way.

9    Q.   Right.  And were you ever left alone in a room with an

10   inmate?

11   A.   Absolutely not.

12   Q.   And typically how many corrections officers, at a minimum,

13   would be in a room with the inmate when you might be providing

14   medical treatment?

15   A.   At least one, but most of the time, two.  Sometimes more.

16   Q.   Now, did you -- when you were with Centurion, what wings

17   did you work -- I'm sorry.  When you were at Santa Rosa, what

18   wings did you work at?

19   A.   Initially, I started working in the little medical area in

20   the annex where there's open population inmates, and they would

21   come for sick call or, you know, like, little appointments.  And

22   then I moved to the psychiatric facility, Q dorm.

23   Q.   Q dorm?

24   A.   Mm-hmm.

25   Q.   When was that?

1    A.   During the time I worked, I don't know exactly, you know,
2    how long I was at each unit.  I don't.
3    Q.   Do you remember prior to June 10th, 2018, approximately how
4    long you had been at the unit, at the dorm?
5    A.   Probably a year.
6    Q.   A year?
7    A.   I'm guessing.  I'm not sure.
8    Q.   Okay.  And did you -- did you work with many of the same
9    officers day after day?
10   A.   Yes.
11   Q.   Did you ever go out to -- into the dorm itself to where the
12   inmates were housed?
13   A.   Yes.
14   Q.   And how often would you do that?
15   A.   I believe that we had to make rounds every 30 minutes, I
16   think, but we couldn't do it by ourselves.  We had to be
17   escorted with an officer.
18   Q.   And you said you made rounds every 30 minutes?
19   A.   Not specifically myself but a nurse.
20   Q.   Okay.
21   A.   And I think it was every 30 minutes, I'm not sure.  Like I
22   said, it's been five years.  I would have to look at the actual
23   flow sheet to jog my memory.
24   Q.   And when you do these rounds, what does that mean?  Are you
25   going cell by cell?

SAENZ - CROSS

1   A.   Yes.

2   Q.   And what are you doing at each cell?

3   A.   Looking to make sure that they're alive and breathing and

4   not in any distress.

5   Q.   How do you do that?

6   A.   Like I'm looking at you, I'm assessing you right now, and

7   you are alive, breathing, and not in any distress.

8   Q.   Okay.  Now, there is a window on those cell doors, correct?

9   A.   Yes, sir.

10  Q.   And are you looking through the window to make your

11  assessment?

12  A.   Yes.

13  Q.   And so, for example, if an inmate is sleeping, would you

14  wake that inmate up just to make sure that they're alive and

15  breathing?

16  A.   Many times I specifically -- if they had their head covered

17  up, I would make the officer knock on it and say the nurse needs

18  to see you, and they'd remove the blanket over your head, move

19  your foot, whatever, yes.

20  Q.   Okay.  And so -- and when you made these rounds, was it

21  required that you would speak, personally speak with the inmate?

22  A.   No.

23  Q.   So many times when you would have these rounds, you just

24  wouldn't communicate with the inmate?

25  A.   No.

SAENZ - CROSS

Q.   Okay.

A.   Unless they had a concern, but usually not.

Q.   And did -- were there times when you might look into a window, and you saw that the inmate was alive and breathing, but they didn't see you?

A.   That's possible.

Q.   Now, I just want to understand.  You talked about the -- there's a medical treatment room itself downstairs, correct?

A.   Correct.

Q.   And upstairs, what is upstairs?

A.   It's like a big chart room.  It had a conference table.  We had therapists that came from another part of the campus and assess their charts, and maybe they had an appointment with one of the inmates there.  Our psychiatrist was there everyday all day, so if he wrote any orders, we had to carry out those orders.

Q.   Did you have a desk of any kind upstairs?

A.   There was several desks so I didn't have a specific one.

Q.   Okay.

A.   We just sat wherever was available.

Q.   But was that basically your office?

A.   No, it was the nurses' and the doctors' office.

Q.   Right.

A.   Yeah.

Q.   But in other words, when you came to work every morning,

1    starting out --

2    A.    That's where I went.

3    Q.    -- that's where you put your belongings?

4    A.    Yes.

5    Q.    That's where you eat your lunch there?

6    A.    That's right.

7    Q.    And so if there was no -- if there was nothing medically

8    going on downstairs in that -- in the treatment room, where

9    would you be?

10   A.    Upstairs.

11   Q.    Unless, of course, you were doing rounds?

12   A.    That's correct.

13   Q.    Now, did you have -- were there medical examinations every

14   day?

15   A.    Pretty much.  Somebody didn't feel good, they were having a

16   sore throat, something, you know, we would have to go and

17   assess.  It wasn't always an emergency.  You know what I mean?

18   Q.    But you were never -- if you didn't have to be down in the

19   medical room, is it my understanding that you weren't -- you

20   weren't there?

21   A.    Right, right.

22   Q.    And now, going back to June 10th, 2018, and first of all,

23   what -- besides the video, what other evidence prior to coming

24   here, whatever documents, I should say, had you reviewed?

25   A.    I met with the defense counsel and they showed me a picture

SAENZ - CROSS

1   to jog my memory of the inmate and to see if I remembered any of

2   the incidents that occurred that day or...

3   Q.   And did I understand you correctly that you don't recall

4   this incident?

5   A.   Which one?

6   Q.   I'm sorry, June 10th --

7   A.   June 10th.

8   Q.   Regarding Mr. Hamze.

9   A.   The day that I actually assessed him after the alleged post

10  use of force?

11  Q.   Correct.

12  A.   I remember them bringing him in.  I was already down there

13  in the triage room, but I do not recall any loud noises, any

14  activity outside of the room.  I don't remember that.

15  Q.   Do you remember how long you had been in the room prior to

16  him coming in from -- the corrections officers bringing him in?

17  A.   I do not.

18  Q.   Do you remember what you were doing at that time in the

19  room?

20  A.   I don't, but I'm assuming since Dr. Rodriguez was there

21  that I -- he was seeing other patients, so I was assisting him

22  and documenting.

23  Q.   Okay.  And so you said that -- you mentioned that -- you

24  looked at the video, and you said, I think something like,

25  clearly his face was not injured in the video, correct?

1    A.    Right, right.

2    Q.    Do you have any personal recollection of what his injuries

3    actually were?

4    A.    After I saw that, I do remember it was just a little, small

5    abrasion.

6    Q.    Okay.  And --

7    A.    And you could clearly see a light pink area right there on

8    the video, too.

9    Q.    If somebody gets punched, for example, in the face, how

10   does bruising sort of develop?  Do you instantly get a big welt,

11   or does it take time?  How does that work?

12   A.    Well, it's different for different people and depends on

13   the force.  But if someone is hit really hard in the face, there

14   will be evidence of it.  You're not going to have your normal

15   color to your face if you've had a blunt force trauma to your

16   face.  It's going to be red and immediately it's going to be

17   turning some kind of color, usually dark red and swelling.  So

18   there is evidence.

19   Q.    Does swelling get worse over time?

20   A.    It could, depending on how deep and how much the trauma

21   was, you know, and the tissues beneath or if there was fractures

22   or -- it just all depends.

23   Q.    And if somebody was punched in the back of the head, for

24   example, and they had some hair, would you necessarily be able

25   to observe bruising immediately after this occurred?

1    A.    Well, not bruising but trauma, if it was swelling, you

2    know, but that would be if someone -- clearly he didn't report

3    that to me or I would have addressed it in my notes.  That's

4    what I'm assuming.

5    Q.    That's what you're assuming?

6    A.    Because that's how I practice my nursing.

7    Q.    So do you recall Mr. Hamze reporting anything to you, as

8    you sit here with your own memory?

9    A.    No.

10   Q.    And you wrote in the emergency report, the record, I

11   believe -- just one second -- that for description of

12   occurrence:  Alleged post-use-of-force with escorting inmate to

13   triage room.

14          I can just put that here for you.

15   A.    Mm-hmm.

16   Q.    Zoom out.  Do you see that?

17   A.    I do see that.

18   Q.    Okay.  Now, if there's some type of post -- if an inmate --

19   well, how much description do you generally give about the facts

20   of what occurred with the incident itself?

21   A.    Well, the thing is, if I didn't witness it -- I believe

22   that the officers had their own form to fill out regarding all

23   the details if there was an incident that occurred with an

24   inmate.  My job is to assess the inmate, and we actually would

25   assess the officers at times, too, with another form.  I can't

SAENZ - CROSS

1   remember what that was.  It was some type of post use of force,

2   but if I didn't witness it, then I'm going to already say

3   alleged post use of force while escorting, and that's what they

4   had obviously told me, that they were escorting the inmate,

5   which I was in there, I know they escorted him in there, so

6   clearly an incident occurred between his cell and the triage

7   room.

8   Q.   Now -- but you didn't witness the incident, correct?

9   A.   No, sir.

10  Q.   And do you remember if Mr. Hamze made any allegations about

11  the incident, as you sit here today?

12  A.   I don't remember that.  I don't remember that.

13  Q.   Now, why did you decide to -- well, let me ask this first.

14       In that -- in the triage room, going back to

15  June 10th, was it stocked with splints?

16  A.   Yeah.

17  Q.   Do you know if five days earlier on June 5th it was stocked

18  with splints?

19  A.   I mean, it had every medical supply that you would have in

20  an ER; so, I mean, I don't specifically remember, but I'm sure.

21  Q.   Were there supply issues with having splints and those

22  types of items back then?

23  A.   No.

24  Q.   And what about if an inmate needed an x-ray, could you have

25  ordered an x-ray?

SAENZ - CROSS

1    A.   No, that's not in my scope of practice.  If the doctor gave

2    me an order to order an x-ray, if I had received a verbal order,

3    then, yes, I could call and facilitate that.  But, no, not

4    myself.

5    Q.   But would you initiate?  Would you say to someone, for

6    example:  I think this person needs an x-ray and to try to get

7    someone an x-ray?

8    A.   If I thought so, yes.

9    Q.   And why -- what made you decide to leave Centurion?

10   A.   I am a nurturing person.  I enjoy seeing and spending time

11   with patients.  In corrections, it's just totally different.

12   Nurses, we -- it's just different.  We treat the person, but

13   there's no getting to know the person, clearly, because, you

14   know, they're inmates and they could be dangerous, and it's not

15   something we want to do.  So clearly that did not satisfy my

16   need to do what I do, be a nurse.  So, you know, I'm not a

17   corrections person.  I'm -- I went into nursing to take care of

18   people and to spend time with people.

19   Q.   If an inmate tells you that:  I was attacked, you know,

20   just now, are you required to document that somehow?

21   A.   I more than likely would.  I don't think that I would

22   ignore it.

23   Q.   Is there any type of mandatory reporting procedure?

24   A.   I don't remember that.  I mean, in our documentation, we

25   document what we're told by patients, but it's alleged, you

SAENZ - CROSS

1   know.  And if -- if we witness or we suspect anything that we're

2   concerned about, then, of course, we would have to, you know,

3   share our concerns.

4   Q.   Prior -- prior to Mr. Hamze being brought into the room,

5   who else was in the room with you?

6   A.   I'm not sure at the moment.  I'm really not sure at the

7   moment.  Dr. Rodriguez may have been, more than likely,

8   according to the video because I didn't see myself, and it was

9   just moments after I had documented that I must have been at the

10  desk right by the -- so could have been Dr. Rodriguez, it could

11  have been one of the other nurses assisting me and

12  Dr. Rodriguez.  I don't know.

13  Q.   Do you know why Mr. Hamze was being brought to medical

14  initially?

15  A.   Well, going through my notes and looking at the video, it

16  was clearly that he was getting -- he had chosen to get a cast

17  rather than the splint.

18  Q.   Why do you say --

19  A.   I think.  I'm not --

20  Q.   -- he chose --

21  A.   I'm not sure.  I'm not sure.  Like I said, this is the

22  first time I've seen this in five years.  And, you know, I see

23  tons of patients.  So if it had happened six months ago and you

24  asked me, maybe I could help you out better, but I am honestly

25  telling you I just -- I just don't remember a specific date, the

1   details of it five years ago.  I just don't.

2   Q.   Do you remember Dr. Rodriguez putting a cast on Mr. Hamze

3   yourself?

4   A.   Yes.

5   Q.   Do you remember if Dr. Rodriguez did anything to manipulate

6   the arm?

7   A.   No, I don't remember that.

8   Q.   If someone has a displaced fracture -- what is a displaced

9   fracture, first of all?

10  A.   Well, it's a -- the bone is completely broken.  It's not in

11  the correct placement that it naturally should be.

12  Q.   Do you mean, like, the bones are out of alignment?

13  A.   That's correct.

14  Q.   And when there is a displacement like that, what's the --

15  for a forearm, do you just put a cast on it?  Is that the normal

16  treatment?

17  A.   I'm not a doctor.

18  Q.   Okay.  All right.  One second.

19           MR. TARJAN:  No further questions, Your Honor.

20           THE COURT:  Any follow-up?

21           MS. BAKER:  Just a few quick areas.

22                       **REDIRECT EXAMINATION**

23  BY MS. BAKER:

24  Q.   I think Mr. Tarjan asked you about your experience with

25  rounds.  Do you recall they were about 30 minutes each time or

SAENZ - REDIRECT

1   every 30 minutes, did you say?

2   A.   I think so.

3   Q.   Okay.

4   A.   I think so.

5   Q.   And you would be escorted by security.  Would there be any

6   sort of announcement made that rounds were occurring?

7   A.   No, they just knew to look for us.  They had to make their

8   own rounds.  And I can't remember the frequency, but they made

9   their rounds in between our rounds, and also with us.  I don't

10  remember the exact frequency but, you know, there was -- they

11  were always looking for us.  They knew when it was about time,

12  and so.

13  Q.   When you say "they" --

14  A.   Downstairs --

15  Q.   -- who are you referring to?

16  A.   Officers.

17  Q.   The officers?

18  A.   Yeah.

19  Q.   Would the inmates sometimes be looking for you?

20  A.   No.

21  Q.   It's a known procedure that medical and staff do rounds?

22  A.   Mm-hmm.

23  Q.   Would inmates voice any concerns to you unprompted?

24  A.   Usually not.

25  Q.   Would security make an announcement regarding a female on

SAENZ - REDIRECT

1    the wing?

2    A.    Yes, they would.

3    Q.    And that was before you would step into the dorm?

4    A.    Yep.

5    Q.    Do you know what the purpose of that was?

6    A.    Because of their horrible, inappropriate behavior when a

7    female would walk by there, yeah.

8    Q.    So would the inmates have knowledge that you were coming?

9    A.    Yes, whenever they were prompted by the officers, you know,

10   announcing that female was on the unit.

11   Q.    Did --

12   A.    Which it didn't stop them from doing obscenities and such.

13   Q.    Did you ever witness obscenities made toward you?

14   A.    All the time, yes.

15   Q.    What type of things?

16   A.    Masturbation, you know, clothes off, saying derogatory

17   sexual type things.  They would say it to the nurses every time

18   we made rounds.

19   Q.    And in the event that an inmate was sleeping, what would

20   you typically document?

21   A.    Like I said, we would make sure that they would move.

22   Officer would knock on the window and arouse them.  But I don't

23   think we specifically documented exactly what each inmate were

24   doing.  We just documented that we made the round.

25   Q.    And it was more like a checkmark in a box?

SAENZ - REDIRECT                              30

1   A.   You know, I can't remember exactly what the flow sheet

2   looked like.

3            MS. BAKER:  I don't have any other questions.  Thank

4   you.

5            THE COURT:  All right.  Thank you, ma'am.  Thank you

6   for being here.  You're free to go.

7            THE WITNESS:  Thank you, sir.

8      *(Witness excused.)*

9      *(End of excerpt.)*

10

11                      * * * * * * * *

12      I hereby certify that the foregoing is a true and correct
    transcript of the stenographically reported proceedings held in
13  the above-entitled matter, pursuant to the provisions of Section
    753, Title 28, United States Code.

14

15  *Julie A. Wycoff*                    4/29/24

16  _____     _____
    Julie A. Wycoff, RMR, CRR       Date
    Official U.S. Court Reporter

17

18                        **I N D E X**

19  <u>Defense Witnesses</u>

20  **DAWN SAENZ sworn**

21        **Direct Examination by Ms. Baker .....................2**

22        **Cross-Examination by Mr. Tarjan ...................14**

23        **Redirect Examination by Ms. Baker .................27**

24

25